UNITED STATES, Appellant and Cross-Appellee

v

CHARLES W. KEENAN, Private First Class, U. S. Marine Corps, Appellee and Cross-Appellant

18 USCMA 108, 39 CMR 108

109

No. 21,024

January 31, 1969

Captain *William S. Foss*, USMCR, argued the cause for Appellant and Cross-Appellee, United States. With him on the brief was *Colonel C. R. Larouche*, USMC.

*Myron G. Ehrlich, Esquire*, and *Lieutenant V. L. Evans*, JAGC, USNR, argued the cause for Appellee and Cross-Appellant, Accused. With them on the brief were *Joseph Sitnick, Esquire*, and *Lieutenant Clinton F. Raymond*, JAGC, USNR.

## Opinion of the Court

QUINN, Chief Judge:

As a result of their conduct during a combat reconnaissance patrol near the hamlet of Tri Binh, Republic of Vietnam, several persons were charged with murder. Two charges of premeditated murder were laid against the accused. After two trials, he was convicted of premeditated murder of Nguyen Qua, an elderly Vietnamese male, and Nguyen Thi Co, his cousin, and sentenced to a dishonorable discharge and life imprisonment. The convening authority reduced the period of confinement to twenty-five years. Thereafter, a board of review dismissed the charge relating to Nguyen Thi Co and reassessed the sentence to reduce the period of confinement to five years.[1] A Government motion to reconsider dismissal of the charge and reassessment of the sentence was denied. Under the provisions of Article 67, Uniform Code of Military Justice, 10 USC § 867, the Judge Advocate General of the Navy and the accused brought the case to this Court for further review. We turn first to the three questions certified for review by the Judge Advocate General.

The third question asks whether the board of review was correct "in summarily denying the Motion for Reconsideration." The board of review had written a lengthy opinion commenting on various assignments of error by the accused. One of the assignments challenged the sufficiency of the evidence to establish that Nguyen Thi Co was alive when the accused shot her. The Government opposed the assignment of error on two grounds. First, it contended that the evidence established the victim was still alive when the accused shot her; and, secondly, that, in any case, the accused aided and abetted the patrol leader in "completing the job" of killing the victim by firing an automatic burst with his M-14 at her, about three to six seconds after the leader had shot the victim in the head with a .45 caliber pistol. The board of review sustained the accused's contentions. Thereupon, the Government moved for reconsideration, alleging that the board of review's opinion indicated it had failed to consider, or to understand, the law of aiding and abetting, and that, as a matter of law, its opinion "demands a finding of guilty" of attempted murder. A divided board of review denied the motion, without opinion.

In United States v Hurt, 9 USCMA 735, 27 CMR 3, we noted that while it is "preferable procedure" for the board of review to indicate reasons for its decision, there is no mandatory

---

[1] During the pendency of this appeal, the Secretary of the Navy mitigated the sentence by changing the dishonorable discharge to a bad-conduct discharge and further reducing the confinement to three years.

rule that it do so. Whether, and when, an explanatory opinion is appropriate rests within "the sound discretion of the judicial body." *Id.*, at page 756. An exposition of reasons for denial of a second consideration of the case is generally less needful than on the initial decision. More often than not, therefore, an application for rehearing is denied without opinion. The fact that the denial is unaccompanied by a statement of reasons does not imply that no consideration, or inadequate attention, was accorded the substance of the application. Accordingly, we answer the third certified question in the affirmative.

The two other certified questions are as follows:

1. Was the board of review correct in dismissing the Additional Charge and its specification without considering the evidence of accused's guilt as an aider and abettor?

2. Was the board of review correct in dismissing the Additional Charge and its specification without considering the evidence of accused's guilt of the lesser included offense of attempted murder?

The language of the questions implies that the board of review did not ■■■■■■■ ■ in fact consider certain evidence relevant to the issues. The board of review's opinion is silent as to what alternatives of guilt and relevant evidence it considered. Its silence does not demonstrate error or oversight. United States v Hurt, supra, at page 756. In apparent acknowledgment of the insignificance of the board of review's silence, the parties have construed the questions as bringing up for review the correctness of the board of review's action in exonerating the accused from all guilt in connection with the death of Nguyen Thi Co. Cf. United States v Wille, 9 USCMA 623, 26 CMR 403. Consideration of this question requires review of the pertinent evidence.

Sometime between 8:30 and 9:00 a. m., September 22, 1966, a ten-man squad set out on a combat-reconnaissance patrol in the Tri Binh area. Corporal Stanley J. Luczko, regarded as a "cool head under fire," was the squad leader. Other members of the squad were the accused, Corporal Paul F. Huber, Lance Corporal Nick Gonzales, Lance Corporal Jerome W, Ketzenback, Privates First Class Billy D. Eakins, David M. Moore, Ronald A. Piatkowski, Oscar Martinez, and Hospitalman Donald L. Buettner. According to the platoon commander, Second Lieutenant James V. Flynn, the accused was a "very good Marine," whom he considered to be "as good, if not better than the rest" of the platoon, which was composed of "some very good troopers." The patrol passed through two small villages. At the first village, it was informed that Viet Cong were present across a rice paddy in the direction of the second village. A check of the immediate area led to discovery of several bundles of wood, which had apparently been abandoned; these were regarded as evidence of Viet Cong presence. In the second village, the patrol discovered a carved replica of a United States helicopter and a rubber tennis shoe; these, too, were considered as evidence of Viet Cong presence. On leaving the second village, Corporal Luczko decided to "double back." Someone noticed "hooches," or houses, across a paddy. Luczko halted the patrol. He divided it into two elements. One group, consisting of six men, was ordered to stay on the trail; the other element, consisting of Luczko, the accused, Eakins, and Moore, formed a skirmish line and moved into the area of the houses. What occurred there led to the filing of the charge of premeditated murder of Nguyen Thi Co against the accused, who allegedly acted "in conjunction with" Corporal Luczko.

Moore and Eakins testified as Government witnesses. According to Moore's testimony, he, Luczko, and the accused approached a house from one side while Eakins moved eastwardly in the brush behind it. Although there is no direct testimony as to the accused's immediate actions, apparent-

ly he entered the house with Luczko, while Moore "checked" an outside area. Finding nothing, Moore returned to the house. Luczko came out, and they "talked for a minute." Luczko then occupied himself with trying to move a calf into a cow pen. Suddenly, Moore became aware of a woman behind him at a haystack. According to him, when he and Luczko saw the woman, Luczko pulled out his .45 caliber pistol and "started to play with it." Luczko then asked "how big a hole . . . it would make in her." Moore testified that, in response to this question, he merely shrugged and turned to walk away. He heard a shot from a .45 pistol. Eakins testified he saw Corporal Luczko engaged in conversation with the woman. Luczko got "a little excited" and started "screaming at her, asking her for her ID" card. The woman merely shook her head. Moore and Eakins agree that the woman appeared to be unarmed, and there was nothing suspicious in her conduct. Eakins asked Luczko where the accused was. Luczko told him the accused was in the house, and he instructed Eakins to go in to help the accused. Eakins did. Both Eakins and the accused testified they heard a shot from the outside of the house and "ran out."

On hearing the pistol shot, Moore turned back toward Luczko. He saw Luczko holding his .45 with his arm extended, and he heard a second shot. Eakins testified he saw Luczko "still at the same spot" at which he had left him. As he approached, Luczko fired at the woman, who seemed to be squatting by the haystack. The accused also approached Luczko and spoke to him. Eakins testified the accused asked Luczko "if he had shot" the woman, and Luczko replied that he had. Moore and Eakins testified that the accused asked a second question. Moore maintained the accused asked: " 'Should I finish her off' "; and Eakins testified that "PFC KEENAN asked Corporal LUCZKO if he wanted him, PFC KEENAN, to finish her off." The accused denied he made any such statement. All agree, however, that

112

Luczko said nothing, but "aimed" his pistol at the woman and fired a third time. The bullet struck her in the head about one inch above the right eyebrow, and the woman went "completely slack." Moore and Eakins believed she was dead. The accused's direct involvement in the incident occurred in the interval of three to six seconds that followed.

As the woman's body began to fall forward, Corporal Luczko said: " 'Finish her off.' " The accused, who testified he was "ready to fact [sic] a firing situation" when he left the house, fired an automatic burst. The shots struck the woman in the head. Eakins estimated that a time interval of "about three seconds" elapsed between Luczko's third shot and the accused's burst. Moore estimated the interval was about four seconds, and the accused thought it was five or six seconds. The accused maintained that he did not "think" the woman was alive when he fired; and Moore stated that the accused told him later he "thought" the woman was dead after Corporal Luczko shot her, and he did not know why he had fired at her. Moore, Eakins, and the accused started to leave the area, but were called back by Corporal Luczko to help him " 'do something with' " the body. Luczko pulled some hay from the haystack, put it across the woman's body, and set it afire with a heat tab provided by Moore. The four "stood there a few minutes," then left.

Lieutenant Commander John L. Reed, a surgeon, testified as a Government expert witness. In his opinion, death was inevitable for a person receiving a wound from a .45 caliber pistol like that of the victim, but he maintained that respiration and heartbeat would be present for a period of four or five seconds thereafter so that for "death certificate purposes" the wounded person would be dying, as opposed to being dead. He admitted that in terms of his definition of death even a headless body would be alive in "theory, and . . . fact" for several moments after decapitation. He also admitted that, in the absence of "seeing the body," it

was difficult to say when death actually occurred. He had never examined the body of Nguyen Thi Co, and had never examined a person with a .45 bullet wound over the right eye.

The board of review indicated it was not convinced beyond a reasonable doubt that the victim was alive at the time the accused fired at her. On the basis of that finding, it absolved the accused of all criminal responsibility in the death of Nguyen Thi Co. Appellate Government counsel contend the board of review's finding of fact "does not automatically render the evidence insufficient to affirm a finding of guilty," either on the ground that the accused aided and abetted Corporal Luczko by "encouraging" him "to complete the crime," or on the ground that he committed the lesser included offense of attempted murder. Although, as noted earlier, the board of review did not set out its reasoning, it was manifestly well aware of the Government's contentions, as set out in its brief on the original hearing and in the application for rehearing. See United States v Reiner, 8 USCMA 101, 103, 23 CMR 325. By denying reconsideration, the board of review patently rejected any view of the evidence that required it, as a fact-finding tribunal, to assess some degree of culpability. It would appear, therefore, that rather than disregarding the evidence relied upon by the Government to support the alternatives of guilt suggested by it, the board of review concluded that this evidence did not establish any degree of guilt beyond a reasonable doubt. See United States v Gebhart, 10 USCMA 606, 28 CMR 172. On this record, the board of review was not wrong as a matter of law.

As to guilt as an aider and abettor, the board of review could reasonably

**Headnote 3** ment's contention that by merely asking Luczko whether he should "finish off" the woman he associated himself with Luczko's purpose and encouraged Luczko to fire the third shot. All the evidence is to the effect that Luczko was in the process of recocking his

pistol when the question was asked; that he said nothing to the accused in response to the question, but raised his weapon, took careful aim, and fired. Luczko fired the first shot at the woman when the accused was in the house with Eakins; he fired his second shot in an interval "[j]ust about time enough" to recock his weapon; and he fired the third and final shot in the same interval required to recock the pistol. The inexorable quality of his actions and his total disregard of the accused and the others indicate that he did not look to anyone for encouragement or assistance. In these circumstances, the board of review could have determined that the accused's question was only a tentative offer to help, which was rejected by Luczko. It could, therefore, have properly concluded that the accused did not aid or abet Luczko in his deadly assault upon the woman.

So far as attempted murder is concerned, military law "has tended toward the advanced and modern position" that holds one accountable for conduct which would constitute a crime if the facts were as he believed them to be. See United States v Thomas, 13 USCMA 278, 286, 32 CMR 278. Here the accused expressly testified that he believed the woman was dead; and the board of review specifically refused to find that she was still alive when the accused fired at her. Moore and Eakins also testified that they believed the victim was dead before the accused fired. The board of review could, therefore, reasonably conclude that the accused knew he was firing at a corpse. This conclusion necessarily absolves him of attempted murder. We, therefore, answer questions 1 and 2 of the Judge Advocate General's certificate by noting that, in dismissing the Additional Charge alleging the premeditated murder of Nguyen Thi Co, the board of review did not err as a matter of law.

Our decision as to the certified questions makes it unnecessary to consider several of the accused's assignments of error, including a contention that the second trial for Nguyen Thi

**113**

Co's death was illegal because, at the first trial, the law officer denied the Government leave to amend the specification to change the victim's name from Nguyen Thi Khung to Nguyen Thi Co and, instead of dismissing the charge because of the variance, granted a defense motion for a finding of not guilty, which was sustained by the court-martial after one member had objected to the law officer's ruling. Article 62, Code, supra, 10 USC § 862. Compare United States v Ivory, 9 USCMA 516, 26 CMR 296, with Fong Foo v United States, 369 US 141, 7 L Ed 2d 629, 82 S Ct 671 (1962); see also United States v Boehm, 17 USCMA 530, 38 CMR 328. We turn, therefore, to the findings of guilty of premeditated murder of Nguyen Qua. A brief statement of the evidence will clarify the several assignments of error alleged by the accused.

Corporal Luczko, the accused, Moore, and Eakins left the area where the woman had been killed to rejoin the the six-man element that had remained on the trail. As they came in sight of the group, one of them "yelled out '[t]here's a man coming'"; the man was "over in the brush to the south" of Luczko's element. Corporal Huber called to Luczko's element to check the man's identification, and Luczko directed Moore and Eakins to "check out . . . [the man's] ID." Moore called to the man, and he and Eakins walked toward him as he approached them. At the point where they met, Luczko and the accused were about fifteen feet away, standing either "next to each other" or about four to five feet apart. Eakins examined the man's identification card and then handed it to Moore, who also examined it. Moore recalled that he had seen the man sometime earlier on the trail and had checked his identification. The man's identification card appeared to be in order; he did not seem to be armed; and neither Moore nor Eakins considered his conduct suspicious. Moore returned the identification card to the man, and Eakins called out to Luczko: " 'He's alright.' " Luczko instructed them "to check out the area in back" of the man. Eakins

started back "at an angle," and Moore walked toward the rest of the patrol. What happened next is described piecemeal by four Government witnesses.

Eakins glanced back and saw the man show his identification card to Luczko; he turned and started toward the rest of the squad. Huber also saw Luczko "checking" the man; the accused was about four to five feet to the rear of Luczko; Huber "looked away." Lance Corporal Gonzales saw the man "walking away from" Luczko; when they were about five feet apart, Luczko raised his .45 pistol and Gonzales heard "a round go off." The shot caused Moore, Eakins, and Huber to turn in Luczko's direction.

Moore testified that, when he "looked . . . facing this area" where Luczko was, he saw the man running, and Luczko had his arm out with his .45 pistol pointing toward the man. Moore heard two more .45 shots from Luczko's "vicinity," then heard Luczko shout: " 'Fire damn it, fire.' " Moore "opened up." According to him, the accused fired a burst "[f]rom the hip." Moore further testified that the man ran up an embankment and collapsed. Moore maintained that he fired at the man in response to Luczko's order and because, when he arrived in Vietnam, he had been told by experienced combat personnel that "if a man runs, shoot him." Eakins testified that when he turned he saw the man about fifteen feet from Luczko, who had his .45 in his hand. Eakins saw Luczko take a "well aimed shot at this old man," who "slumped to his knees," recovered and started toward the bushes. As he watched, he heard an "automatic burst" from the "direction" of Luczko and the accused. Luczko faced him and "hollered '[f]ire, damn it, fire.' " He raised his rifle and fired. He testified he fired because he had been "trained to obey" orders "without asking any questions," and he saw Luczko had the .45 "pointed" at him and he thought Luczko would "use" it if he did not obey.

Gonzales, who was with the six-man

element, also saw Luczko "raise his pistol," and he heard a round go off. He then heard a "lot of firing going on." He saw the accused walk to about two feet from the man and point his rifle at him, and then Gonzales heard about ten rounds go off. Another witness testified the victim had multiple gunshot wounds in the chest which formed a deep cavity in the shape of an inverted triangle. Gonzales also fired when all the firing "was going on." He did so because Luczko had previously ordered them to "fire on anybody who comes up there." Huber testified he saw the man walking away from Luczko, who had his pistol in his hand; he heard a round go off and the "next thing" he heard a "bunch of rounds." The man ran up the embankment and fell. Huber did not fire because he "didn't see any reason why" he should. The two elements of the squad then rejoined. According to Eakins, Piatkowski and Ketzenback asked Luczko if they could look at the man's body. He gave them permission to do so. Both men "head[ed] back in the direction of where the man was." Shortly afterward, Piatkowski called out that the man was " 'blinking his eyes and he's moving his mouth.' " Huber testified that Piatkowski asked what he should do, and Luczko replied: " 'Finish him off.' " He further testified that Piatkowski "pulled out his .45, aimed it down and fired." Piatkowski and Ketzenback rejoined the squad, and it returned to the company command post, with instructions from Luczko to say nothing about the incident.

The accused was charged with premeditated murder of Nguyen Qua "in conjunction with" Luczko and Piatkowski. At his first trial, the question of accused's guilt or innocence of this charge was not submitted to the court-martial. Instead, after some discussion about the evidence pertaining to the assault on the woman, the law officer concluded that an instruction to the court members to disregard the evidence as to the dismissed charge would be useless because they probably could not "erase this evidence" from their minds. In his opinion, there was an ineluctable "carry over" because the offenses occurred in a "short period of time." Over defense counsel's objection he declared a mistrial. Thereafter, the charge was referred to trial a second time, together with a new specification alleging the murder of Nguyen Thi Co. The accused moved to dismiss both charges on the ground of former jeopardy. The motion was denied, and the ruling was affirmed by the board of review.

A mistrial can be declared by the law officer when required by "manifest necessity." United ■■■■■■ ■ States v Waldron, 15 USCMA 628, 36 CMR 126; United States v Patrick, 8 USCMA 212, 24 CMR 22. Various situations fall within the rule. Among them is the condition created by receipt of information that another serious crime was probably committed by the accused. If there is reasonable likelihood that the court members cannot, or probably will not, disregard this evidence, despite instructions to do so, the law officer may properly declare a mistrial. The ruling involves a degree of discretion, and an appellate court will not overrule it unless there was a clear abuse of that discretion. United States v O'Neal, 16 USCMA 33, 38–40, 36 CMR 189. We are not convinced there was an abuse of discretion in this case.

Although the accused did not testify as to the assault on Nguyen Qua, one of the principal arguments of counsel dealt with whether the accused, like Moore, Eakins, and Gonzales, merely responded to Corporal Luczko's order to fire. Appellate defense counsel present several assignments of error dealing with the matter. We consider first the contention that the evidence is insufficient to show that Luczko's order to fire at Nguyen Qua was illegal.

Appellate defense counsel maintain that all the witnesses "testified that they had been ■■■■■■ ■ told to fire" in two situations: (1) When ordered to do so,

and (2) whenever a man turned and ran. From this testimony, counsel argue that each of the witnesses conducted "himself in line with training received from the Marine Corps"; and they conclude that this evidence, coupled with the presumption that military orders are legal (Manual for Courts-Martial, United States, 1951, paragraph 169), establishes that the proof is insufficient to demonstrate that Luczko's order was illegal. The difficulty with the argument is that it goes far beyond the evidence.

To begin with, the accused did not testify that he fired because of Luczko's order. Secondly, neither Moore nor Eakins' testimony establishes that their conduct was "in line" with Marine Corps training. Moore testified only that he had been told by a "few of the men who had been . . . [in Vietnam] longer" to fire when he saw anyone running; this testimony is a long way from establishing that the advice was part of Marine Corps training. Eakins did not testify about any such advice, and he maintained that his "main reason" for firing at the man was because "Corporal LUCZKO was facing me with his .45, and it was pointed at me." Corporal Huber, like Eakins, said nothing about previous advice to fire at persons running, and he did not fire at all because he "didn't see any reason" to do so. According to the record, the only instructions about firing that were given the patrol were those given by Luczko before he went to check the house. Gonzales testified these instructions were to fire "on anybody who comes up there." In any event, even if we assume instructions were in effect to fire at persons running, there is substantial evidence from which the court-martial could conclude that the victim was not running when shot by the accused. Gonzales testified as follows:

"Q. Alright, now after hearing the round discharge, would you describe what took place?

"A. Well, the man started walking back towards Corporal LUCZKO, sir, and then he walked away from Corporal LUCZKO.

"Q. Continue.

"A. Well, the second time the man walked away from Corporal LUCZKO, I seen Corporal LUCZKO raise his pistol. Then at the same time I heard a round. Shortly after that, sir. The man kept walking, sir, and there was a lot of firing going on at that time, sir.

. . . . . .

"Q. Alright, continue, how you observed the man from this point on?

"A. Well, sir, shortly after that, the man kept walking, then he fell. Then, I saw PFC KEENAN walk up to the man and I heard a few rounds, sir.

"Q. How far away was PFC KEENAN from the man as he walked up to him?

"A. About two feet.

"Q. And what did he do when he approached the man?

"A. Well, sir, he pointed his rifle down at him, sir.

"Q. Was the rifle pointed at the man?

"A. Yes, sir.

"Q. What did you hear at this time?

"A. I heard a few rounds, sir.

"Q. How many rounds would you say you heard discharge at this point?

"A. About ten rounds, sir.

"Q. And when was this that PFC KEENAN approached the man?

"A. Just after the man fell, sir.

"Q. Just after he fell?

"A. Yes, sir."

With the exigencies of hostile fire or unusual circumstances excluded from consideration, the court-martial could reasonably find that Luczko's order to fire was illegal. The man was apparently unarmed, had twice been stopped, and had twice submitted his identification card for examination. Apparently he had in no way behaved in a suspicious or unusual manner. As Corporal Huber testified, the situation appeared to be "entirely normal." Since there was no apparent reason to

resort to force to stop the old man, there was manifestly no reason to fire at him with an automatic weapon from a distance of about two feet. In our opinion, the evidence amply supports the court-martial's rejection of the defense contention that the accused's conduct was justified by either Marine Corps training or Corporal Luczko's order.

Turning to the instructions, appellate defense counsel have assigned several alleged errors. First, they contend that a part of the instructions provided the court members with an erroneous standard by which to measure the accused's guilt or innocence. See United States v Roth, 16 USCMA 465, 37 CMR 85. The contention is based upon a single sentence which is underscored in the excerpt set out in the footnote below.[2] In our opinion, the sentence does not refer to the burden of proof but to consideration of reasonable inferences that may be drawn from matters properly admitted in evidence. We discern no merit to this assignment of error.

A two-part error is alleged in connection with the instructions on the defense of justification.[3] It is contended first that the law officer erred by not advising the court members

_____

[2] ". . . Now the evidence in this case consists of the sworn testimony of the witnesses, all exhibits which have been received in evidence and all facts which have been admitted or stipulated, and all applicable inferences stated in these instructions. Any evidence as to which an objection was sustained by the Law Officer, and any evidence ordered disregarded by the Law Officer, must be entirely disregarded. You are to consider only the evidence in the case. But in your consideration of the evidence, you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw from facts which you find, have been proved and such inferences as seem justified in light of your experience. An inference is a deduction or conclusion which reason and common sense, lead the court to draw from the facts which have been proved. *Now, there is nothing perculiarly* [sic] *different in the way a court is to consider the proof in a criminal case, from that which all reasonable persons treat any question, depending upon the evidence presented to them.* You are expected to use your good sense and consider the evidence for only those purposes for which it has been admitted and give it a reasonable and fair construction. Keep constantly in mind that it would be a violation of your sworn duty to base a verdict upon anything but the evidence in the case. If the accused be proved guilty, say so, if not proved guilty, say so. Remember at all times that the accused is entitled to an acquittal, if any reasonable doubt remains in your minds. Remember also, the question will never be 'Will the government win or lose the case.' The government always wins when justice is done, regardless of whether the verdict be guilty or not guilty." [Emphasis supplied.]

[3] ". . . [W]e've had evidence in the case regarding orders by a superior and the legality thereof. The general rule is that the acts of a subordinate done in good faith and in compliance with a supposed duty or order are justifiable. This justification does not exist however, when these acta [sic] are manifestly beyond the scope of his authority, or the order was of such a nature that a man of ordinary sense and understanding would know it to be illegal. Thus, the acts of a Marine done in good faith and without malice, in the compliance with the orders of a superior . . . [are] justifiable, unless such acts are manifestly beyond the scope of his authority, and such that a man of ordinary sense and understanding would know them to be illegal. Therefore, it [sic] you find beyond a reasonable doubt that the accused under the circumstances of his age and military experience could not have honestly believed the order issued by his squad leader to be legal under the laws and usages of war, then the killing of the alleged victim was without justification. A Marine is a reasoning agent, who is under a duty to exercise judgment in obeying orders to the extent that where such orders are manifestly beyond the scope of the authority of the one issuing the order, and are palpably illegal upon their face, then the act of obedience to such orders will not justify acts pursuant to such illegal orders."

they "must find Corporal Luczko's orders to be illegal before the accused could be found guilty." The second allegation is that the law officer compounded the error of omission by instructing the court members they were not to consider the guilt of any person other than the accused in arriving at their findings. The board of review considered the contentions and concluded there was no merit in them. We agree.

As to the first part, the instructions are not phrased as appellate defense counsel now phrase them. Rather they correctly apprised the court members that a homicide committed in obedience to a lawful order is justified, but one in execution of a patently illegal order is not. See United States v Schreiber, 5 USCMA 602, 18 CMR 226. As to the second part of the argument regarding the court's determination of the accused's guilt or innocence, we cannot follow appellate defense counsel to their conclusion that the instructions "deleted an important element of the crime of murder based upon the theory of aider and abettor." In context, the challenged instruction was a correct statement that the trial concerned this particular accused, and the court's duty was to determine, on the basis of the evidence before it, this accused's guilt or innocence, not that of any other member of the patrol, several of whom had admitted firing at the victim.

Threaded through the accused's argument are references to other members of the patrol who were not convicted of complicity in the deaths of Nguyen Qua and Nguyen Thi Co. One of these references, which was accompanied by a lengthy excerpt from the transcript of Luczko's record of trial, was the occasion for a Government motion to strike. We denied the motion. Our answers to the certified questions, which affirm the board of review's dismissal of the findings of guilty in regard to Nguyen Thi Co's death, made it unnecessary for us to determine whether, or to what extent, we should consider testimony in these cases in connection with the several assignments of error advanced by counsel for this accused. See United States v Dickenson, 6 USCMA 438, 20 CMR 154. There remains, however, an unarticulated assertion that to affirm the accused's conviction of premeditated murder of Nguyen Qua would be a miscarriage of justice because of the results reached in the separate trial of Corporal Luczko and Private First Class Piatkowski. We are informed by appellate defense counsel that Luczko was "acquitted of murder" and Piatkowski was convicted only of attempted murder.

The verdict in Piatkowski's case is not inconsistent with the findings of guilty against this accused. Even from evidence in this record, it is apparent that Piatkowski acted separately and at a different time from the accused. Determination of the criminality of the accused's conduct, therefore, in no way depends upon, or requires reference to, Piatkowski's conduct. Cf. United States v Kidd, 13 USCMA 184, 32 CMR 184. United States v Jackson, 6 USCMA 193, 201, 19 CMR 319. In fact, the evidence here indicates that when Piatkowski approached the victim, the latter already had a gaping wound in the chest as a result of the burst of automatic fire he received from the accused; it would, thus, be reasonable to conclude, as apparently the court-martial at Piatkowski's trial concluded, that the victim was for all practical purposes dead when Piatkowski shot him with a .45 caliber pistol. In this regard, the situation is similar to the accused's involvement in the death of Nguyen Thi Co. As noted earlier, the accused testified that he believed Nguyen Thi Co was dead when he fired at her; but Piatkowski apparently believed that Nguyen Qua was alive when he fired at him, as evidenced by his statement that the man was " 'blinking his eyes and he's moving his mouth.' " The accused's belief led the board of review to dismiss the murder charge against him; Piatkowski's belief that the victim was still alive justified his conviction for at-

tempted murder. United States v Thomas, supra.

Corporal Luczko's acquittal of complicity in connection with the death of Nguyen Qua is viewed by appellate defense counsel as demonstrating that the court-martial that tried Luczko "obviously felt the killing of the man was legal." However, there is evidence in this case which suggests that Luczko's acquittal "of murder" was probably not predicated upon the nature of his order but upon the extent to, and the circumstances under, which he participated in Nguyen Qua's death. Cf. United States v Kidd, supra, opinion by Chief Judge Quinn. Gonzales' testimony indicates Luczko's shots inflicted no fatal injury, while those of this accused at least conjoined to end the victim's life. Probable differences in the evidence and the inferences drawn therefrom make it apparent that Luczko's acquittal does not require reversal of the findings of guilty against this accused. United States v Whitman, 3 USCMA 179, 11 CMR 179; United States v Gordon, 2 USCMA 632, 10 CMR 130.

The decision of the board of review is affirmed.

Judges FERGUSON and DARDEN concur.