UNITED STATES

v.

Senior Airman William M. CHURCH, FR 279–58–8055 United States Air Force.

ACM 27324.

U.S. Air Force Court of Military Review.

Sentence Adjudged 16 Sept. 1988.

Decided 26 Oct. 1989.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Major Lynne H. Wetzell.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Captain Morris D. Davis.

Before LEWIS, BLOMMERS and KASTL, Appellate Military Judges.

## DECISION

BLOMMERS, Judge:

■ Before a general court-martial with members, the appellant, contrary to his pleas, was found guilty of the attempted premeditated murder of his wife in violation of Article 80, UCMJ, 10 U.S.C. § 880.[1] His sentence, as adjudged and approved,

extends to a dishonorable discharge, confinement for ten years, forfeiture of all pay and allowances, and reduction to airman basic (E–1). The principal issue raised before us is framed by appellate counsel as follows:

WHETHER THE MILITARY JUDGE ERRED IN DENYING TRIAL DEFENSE COUNSEL'S MOTION FOR A FINDING OF NOT GUILTY OF THE CHARGE AND SPECIFICATION OF ATTEMPTED PREMEDITATED MURDER, AS THE EVIDENCE FAILED TO SHOW ANY ACTS ON THE PART OF THE APPELLANT BEYOND MERE PREPARATION, NOR THAT ANY ACT OF THE APPELLANT TENDED TO EFFECT THE COMMISSION OF THE INTENDED OFFENSE.

Simply stated, it is asserted that the evidence is not sufficient to support findings of guilty of attempted murder. We disagree and affirm. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987).

This case involves contracting out for the commission of a crime. As appellate counsel note, the facts of this case present an issue of first impression for the military appellate courts in applying principles of law relating to "attempt" crimes. The specification in question alleges that the appellant "did, at Grand Forks Air Force Base, North Dakota, from on or about 25 April 1988 to on or about 26 April 1988, attempt to, with premeditation, murder ... [his wife] by procuring, assisting, and counseling Nicholas J. Karnezis to commit, for payment in United States currency, the premeditated murder of the said ... [wife]." In order to be found guilty of an attempt, the evidence must establish "a specific intent to commit the offense accompanied by an overt act which directly tends to accomplish the unlawful purpose." MCM, Part IV, para. 4c(1) (1984). The act in question must amount to more than mere prepara-

---

1. He was also charged with attempted conspiracy to commit premeditated murder, but the military judge granted a defense motion to dismiss that offense as being multiplicious with the offense of attempted premeditated murder. We also note that there can be no conspiracy when a supposed participant merely feigns acquiescence in the criminal venture to secure another's detection and apprehension by proper authorities. *United States v. LaBossiere*, 13 U.S.C. M.A. 337, 32 C.M.R. 337 (1962).

tion to commit the offense.[2] A solicitation to commit an offense in violation of Article 134, UCMJ, 10 U.S.C. § 934, on the other hand, is committed if one counsels or advises another to commit an offense with the specific intent that the offense solicited be committed. No overt act directly tending to accomplish the unlawful purpose is required. During oral argument, appellate defense counsel conceded that the appellant is guilty of soliciting another to commit murder, but argued forcefully that he was not guilty of attempted murder because no act beyond mere preparation was proven.[3] To resolve this matter, it will be necessary to review the evidence of record in some detail.

## Facts

The appellant and his wife were married in 1985, and a son was born of this union about a year later. In 1987, they experienced marital difficulties which eventually led to their separation. By an order dated 5 October 1987, the local district court awarded custody of the child to the appel-

lant's wife, and shortly thereafter she returned with the child to her home in Michigan. The appellant loved his son and desired to regain custody of him, but began to realize it was unlikely he would be able to do so through the courts.

Sometime between Thanksgiving and Christmas of 1987, the appellant, a security policeman, asked Senior Airman Mohon, a former co-worker, if he knew anyone the appellant could hire to kill his wife. Mohon did not take the appellant seriously. Sometime in January 1988, Senior Airman Kowalkowski, a co-worker, and the appellant were talking about the appellant's marital difficulties, and the appellant commented that he would be better off if his wife was dead. Shortly thereafter, during another conversation, the appellant asked Kowalkowski if he had any friends from a big city. Kowalkowski did not take the appellant seriously either.

On about 31 March 1988, Airman Meyer, another co-worker, was talking with the appellant in the hallway of their dormitory.

2. Other parts of paragraph 4c, Part IV of the Manual provide the following guidance:

(2) *More than preparation.* Preparation consists of devising or arranging the means or measures necessary for the commission of the offense. The overt act required goes beyond preparatory steps and is a direct movement toward the commission of the offense. For example, a purchase of matches with the intent to burn a haystack is not an attempt to commit arson, but it is an attempt to commit arson to applying [sic] a burning match to a haystack, even if no fire results. The overt act need not be the last act essential to the consummation of the offense. For example, an accused could commit an overt act, and then voluntarily decide not to go through with the intended offense. An attempt would nevertheless have been committed, for the combination of a specific intent to commit an offense, plus the commission of an overt act directly tending to accomplish it, constitutes the offense of attempt. Failure to complete the offense, whatever the cause, is not a defense.

(3) *Factual impossibility.* A person who purposely engages in conduct which would constitute the offense if the attendant circumstances were as that person believed them to be is guilty of an attempt. For example, if A, without justification or excuse and with intent to kill B, points a gun at B and pulls the trigger, A is guilty of attempt to murder, even

though, unknown to A, the gun is defective and will not fire. Similarly, a person who reaches into the pocket of another with the intent to steal that person's billfold is guilty of an attempt to commit larceny, even though the pocket is empty.

(4) *Solicitation.* Soliciting another to commit an offense does not constitute an attempt

...

The Analysis to the 1984 Manual indicates that these provisions are based on paragraph 159 of the 1969 Manual. MCM, App. 21, para. 4 at A21–83 (1984). Paragraph 159 provided in part:

An accused may be guilty of an attempt even though the commission of the intended offense was impossible because of unexpected intervening circumstances or even though the consummation of the intended offense was prevented by a mistake on the part of the accused. The physical impossibility of committing the intended crime does not constitute a defense.

MCM, 1969 (Rev.), para. 159 at 28–7.

3. Among other punishments, confinement for 20 years is authorized for attempted murder, whereas the period of confinement authorized for soliciting another to commit murder is 5 years. At trial, the parties agreed that solicitation to commit murder was a lesser included offense to the attempt as charged, and the court members were appropriately so instructed.

The appellant said that since Meyer was from a big city, he wondered if Meyer knew anybody who could do a job for him. Knowing the appellant's family situation, Meyer believed the appellant was talking about getting someone to kill his wife so he could regain custody of his son. Meyer replied that he would check around and make some calls, but really did not take the appellant seriously. A couple of days later he made one call to a friend back in New York in the appellant's presence. He asked his friend, "Do you know anybody that you could find to eliminate this guy's wife so he can get custody of his kid?" The appellant gave no indication he had just been kidding around or joking when Meyer asked this question. On another occasion when Meyer was present, the appellant made a rough drawing of the residence where his wife was living and explained how easily someone could gain access to it. On about 6 April, Meyer went with the appellant to the city of Grand Forks to pick up tax returns. During the trip, the appellant said he was expecting an $800.00 refund and implied it could be used to pay for his wife's killing.

On 7 April 1988, Sergeant Skyberg, a co-worker and friend, received a message that the appellant wanted to talk to him. Skyberg phoned the appellant and asked him what he wanted to talk about. The appellant indicated that the matter was too private to discuss over the phone, and Skyberg arranged to meet the appellant at his dormitory room. After Skyberg arrived, the appellant asked him if he knew anyone "who could ... [the appellant gestured with his hand, his fingers arranged as if to simulate a gun] his wife." The appellant indicated that he felt that was the only way he could get custody of his son. He said he was getting out of the service in about a month, and wanted "it" done before he left so he would have a good alibi as to where he was at the time. Skyberg believed the appellant was serious. A few other airmen, including Airman Meyer, entered the room and they changed the subject of conversation. After all had left except Skyberg and Meyer, the conversation about the appellant's wife was resumed. The appel-

lant talked in more detail about the location of his wife's home in Michigan, and a hotel close by where someone doing the job could stay. He indicated her house was up for sale, so someone could easily get inside by posing as a prospective buyer. He said he could provide a detailed map of the area, and would be able to raise "a few grand" for the job. The appellant said this was not a spur of the moment thing, but something he had been thinking about for the last few months. Meyer indicated that he had tried to contact someone on the appellant's behalf. After leaving the appellant's room, Skyberg and Meyer discussed the matter further and decided to contact the Office of Special Investigations (OSI).

After talking with Skyberg and Meyer the following day, OSI decided to open up an investigation and attempt to place an undercover agent in the role of a hit man. Meyer agreed to assist them by introducing the appellant to the undercover agent. On 15 April 1988, Meyer was instructed to contact the appellant and tell him that his [Meyer's] friend in New York had found someone to do the job if the appellant was still interested. The appellant indicated he was, and Meyer told him an individual by the name of "Nick" (in reality, Special Agent Nicholas J. Karnezis) would call him on the evening of 19 April. The appellant subsequently borrowed $400.00 from Meyer (money provided by OSI) to help pay the hit man.

Nick called the appellant as planned, and indicated they had some business to discuss. Nick related that he would need a picture of the appellant's wife, a sketch of the house, and maps of the local area in Michigan. The appellant said he already had the picture and a detailed diagram of the residence, and that he could get the maps. Nick indicated he would need $500.00 up front for expenses. It was agreed they would meet at the Holiday Inn in Fargo, North Dakota on 22 April 1988, and that the appellant would wear an Ohio State football jacket and carry a *Time* magazine so Nick could recognize him.

The meeting occurred as planned. After some discussion about his family situation,

the appellant indicated he wanted his wife killed. The appellant said he had brought the things Nick had asked for and had $1,100.00 with him, $500.00 for the job, plus $600.00 for air fare. After discussing the location of the appellant's wife's residence, Nick simulated a phone call to an airline ticket agent, booking a flight to Marquette, Michigan. The appellant provided Nick with pictures of his wife and son; a spiral notebook containing a list of people who lived in the house and hours they were away from home, two detailed diagrams of the house and surrounding area, and directions on how to get to the house from the Marquette airport; a Rand–McNally road atlas with two different routes from the airport to the house highlighted; and, a local Marquette area phone book, which included the phone number at his wife's home. They discussed the schedules of the residents, the vehicles they drove, where the dogs were located, closets in the house where guns were kept, and other details of the planned murder. They settled on a total price of $2,100.00 if the job went as easily as the appellant indicated it should. The appellant gave Nick the $1,100.00 he had brought with him. Nick asked for ideas on how the killing should be done, and the appellant said it seemed to him the easiest way was to make it look like a robbery and that his wife got in the way. As to the weapon, he indicated a knife or gun could be used. Nick showed the appellant a .22 caliber semi-automatic pistol, equipped with a silencer, that he had in his brief case. Nick asked the appellant if he had any "special requests" as to how he wanted it done. The appellant replied "one in her head and one in her ..." (using a slang term for a private part of the female anatomy). Nick expressed concern about the appellant's wife's grandfather, who also lived in the house and did not work. The appellant indicated there should be no witnesses, and that if the grandfather got in the way Nick should take care of him too. The appellant indicated he wanted the job done while he was at work so he would be very visible. He provided Nick with his work and dormitory phone numbers, and Nick said he would be in

touch, and for the appellant to expect a call around 8:00 to 8:30 p.m.

Nick called the appellant from K.I. Sawyer Air Force Base, Michigan (a base located close to Marquette) on 24 April. He told the appellant that his wife had moved, and that the job would cost more, another $500.00, since he would have to locate where she was living. The appellant agreed to pay the additional amount. That evening the appellant asked Airman Meyer to call directory assistance in Michigan for him to find out his wife's new phone number. Meyer did, and gave the new number to the appellant. (A fair inference is that the appellant obtained the number so he could provide it to Nick if Nick was unable to locate the appellant's wife on his own.) Nick called again the following day, indicating he had located the appellant's wife and that the job would be done between then and the following morning. The appellant said that was fine. He indicated he had the other $1,000.00, but that it would take a little longer to come up with the additional $500.00.

On the morning of 26 April, the appellant was notified of his wife's death by his unit commander. According to Airman Meyer, the appellant told him that everyone was sympathetic and that the appellant put on "a Class A act," including crying and laying down on the first sergeant's couch. Later that day, the appellant received a message to meet Nick down in Fargo. He proceeded to the Holiday Inn in Fargo. He told Nick he had received notification of his wife's death. Nick said: "You mean you got the word already?" And the appellant replied: "You do good work." Nick showed the appellant a picture of his wife laying on the floor with what appeared to be two bullet wounds, one in her head and another in her neck. The appellant confirmed that it was his wife. After some further discussion, he gave Nick $1,000.00. At that point Nick identified himself as a government agent and apprehended the appellant. The two meetings between the appellant and Nick at the Holiday Inn were both video and audio tape recorded (the tapes were admitted in evidence at trial).

*An Attempt or Only a Solicitation?*

■ On the appellant's behalf, it is forcefully argued that his conduct never passed the threshold from mere preparation (i.e., a solicitation) to an attempt to commit the offense because there was no "dangerous proximity" to success of the planned murder. *See Hyde v. United States*, 225 U.S. 347, 388, 32 S.Ct. 793, 810, 56 L.Ed. 1114, 1134 (1911) (Justice Holmes dissenting); Perkins, *Criminal Law* 572 (2d Ed.1969). Since there is little military authority on point, appellate counsel rely principally on state court approaches to this dilemma.[4] *See, e.g., State v. Otto*, 102 Idaho 250, 629 P.2d 646 (1981); *Hobbs v. State*, 548 S.W.2d 884 (Tex.Ct.App.1977); *Johnson v. Sheriff, Clark County*, 91 Nev. 161, 532 P.2d 1037 (1975); *Hutchinson v. State*, 315 So.2d 546 (Fla.App.1975); *People v. Adami*, 36 Cal. App.3d 452, 111 Cal.Rptr. 544 (1973); *Smith v. State*, 279 So.2d 652 (Miss.1973); *State v. Miller*, 252 A.2d 321 (Me.1969); *State v. Lourie*, 12 S.W.2d 43 (Mo.1928); *State v. Davis*, 319 Mo. 1222, 6 S.W.2d 609 (1928). In various factual situations involving "contracting out" for crimes, these courts held that the evidence only established mere acts of preparation not leading directly or proximately to consummation of the intended crime.[5] For example, in *Adami* the Court concluded that "the contemplated murder would not have resulted in the usual course of natural events since neither the 'agent' nor the solicitor [defendant] did any unequivocal overt act which can be said to be a commencement of the commission of the intended crime." *People v. Adami*, 111 Cal.Rptr. at 548.

Typical, and perhaps closest factually to the present appellant's case, are the companion cases of *Davis* and *Lourie*. They involved a plan hatched by two lovers to murder the woman's husband (Edmon Lourie) so that they could get his life insurance amounting to $66,000.00. The parties resided in Kansas City, Missouri. In furtherance of their plan, Davis engaged a man named Leverton to find an ex-convict who would commit the murder for hire. However, Leverton disclosed the plot to the police. Thereafter, several meetings were held between Davis, Leverton and an undercover police officer, Dill. It was agreed that Dill would kill Mr. Lourie for $600.00 and diamonds valued at about $3,000.00 owned by the Lourie's. Also, arrangements were made for Dill to meet Mrs. Lourie so they would be able to recognize each other. It was decided that the contemplated assault would occur in Chicago, where Mr. Lourie had gone on business. Davis provided Dill a map showing where Mr. Lourie could be located and two photos of him. If Dill could not locate him, Mrs. Lourie would also travel to Chicago to assist. However, this part of the plan was interrupted when Mr. Lourie returned early from his trip. It was then decided that Mrs. Lourie would persuade her husband to go out for a night on the town, and that they would leave their home at 8:00 p.m. on a certain date. Mrs. Lourie was to have the diamonds on her person so it would appear that robbery was the motive for the crime. She would be "mussed up", and then faint, permitting Dill time to escape. On the evening in question, Dill, accompanied by three other police officers, proceeded to the Lourie residence as planned. The Lourie's were dressed and ready to leave; Mrs. Lourie had the diamonds on her person. Davis, also as planned, was at home in another part of the city in order to have an alibi. Two of the officers entered the residence and took charge of the Lourie's,

---

**4.** Our research has revealed only two reported military cases involving a factual situation (contract murder) similar to the one present in this case. *United States v. Vanderlip*, 28 M.J. 1070 (N.M.C.M.R.1989); *United States v. Jones*, 14 M.J. 740 (A.F.C.M.R.1982). In both those cases the accused was charged with soliciting another to commit murder, not attempted murder. They are not dispositive of the issue we face. *See also United States v. Thomas*, 13 U.S.C.M.A. 278, 32 C.M.R. 278 (1962) for an excellent and extensive discussion of the various principles developed by courts and legal scholars in an effort to deal with attempt crimes where impossibility of completion of the substantive crime is involved.

**5.** It should be recognized that many of these decisions rest, at least in part, upon interpretation of state statutes.

while Dill and the other officer proceeded to Davis' residence and arrested him. The Supreme Court of Missouri concluded:

> The employment of Dill as agent to murder Lourie was not tantamount to an attempt. Dill not only had no intention of carrying out the expressed purpose of defendant, but was guilty of no act directly or indirectly moving toward the consummation of the intended crime. He did nothing more than listen to the plans and solicitations of defendant without intending to act upon them. It was not shown that Dill committed an act that could be construed as an attempt. The arrest of Lourie, his wife, and defendant as detailed in the evidence could not be said to be an act involving the consummation of the crime. (Citations omitted.)

*State v. Davis*, 6 S.W.2d at 612. The Court adopted the same rationale in its decision in *State v. Lourie*. The Court acknowledged that the defendants were guilty of soliciting another to commit murder, a crime not charged. (Apparently under Missouri law that offense is not a lesser included offense to murder or attempted murder.)

Not all authority favors the defense position. A few state courts have upheld attempt convictions in cases involving crimes for hire. *See, e.g., Braham v. State*, 571 P.2d 631 (Alaska 1977), *cert. denied* 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978); *State v. Gay*, 4 Wash.App. 834, 486 P.2d 341 (1971); *State v. Mandel*, 78 Ariz. 226, 278 P.2d 413 (1954); *Stokes v. State*, 92 Miss. 415, 46 So. 627 (1908). These cases stand for the proposition that once the intent that a crime be committed is clearly proved, "slight acts" on the part of the solicitor will support an attempt conviction. For example in *Gay*, payment by the solicitor was considered a sufficient overt act directed toward commission of the intended crime.

Appellate defense counsel urge that it would be inappropriate to adopt this minority view under military law. Doing so, it is argued, would violate "the very essence of

the requirement that a sufficient *actus reus* be proven before criminal liability will attach." Perhaps so, because our law requires "a direct movement toward the commission of the offense," and provides that "[s]oliciting another to commit an offense does not constitute an attempt" (though solicitation can be a lesser included offense). MCM, Part IV, para. 4c (1984).[6]

We are not convinced, however, that military law should extend so far as to hold that a factual situation such as that present in the *Davis* and *Lourie* cases will not constitute an attempt to commit a crime. In this regard, we find solace in the reasoning of some of the dissenters in the foregoing cases. In *Davis*, Chief Justice Walker wrote: "Without limitation it may be said that the defendant did everything within the contemplation of malicious human ingenuity to enable the putative murderer to commit the crime, short of actual participation therein." *State v. Davis*, 6 S.W.2d at 616. In *State v. Otto* (defendant soliciting undercover agent to commit murder, paying him $250.00 up front with promise of larger sum after crime was committed, not sufficient to support conviction of attempted murder), Chief Justice Bakes observed:

> [T]he acts here went far beyond an offer of "employment" [a solicitation].... [T]he type of weapon to be utilized and the manner in which the hit was to be made were discussed, an agreement was reached, payment was made, and the defendant completed all necessary steps preliminary to the "hit" being made.
>
>     \*    \*    \*    \*    \*    \*
>
> The real question is whether acts of preparation when coupled with intent have reached a point at which they pose a danger to the public so as to be worthy of law's notice.
>
>     \*    \*    \*    \*    \*    \*
>
> Whether a person takes on for himself the task of trying to kill another person, or tries to bring about that killing through hiring another to perform the

---

**6.** *See* Annotation, *What Constitutes Attempted Murder*, 54 ALR 3d 612 (1974) for an extensive discussion of this subject.

deed, is in actuality nothing but a matter of personal choice. While the principal is guilty of murder when the contract is performed, an attempt has been made when the bargain is struck.... If criminals are going to contract out their services, and if there are persons who will retain those services, there is no reason why the criminal courts should decline to respect· those contracts.

*State v. Otto,* 629 P.2d at 653–654.

To a great extent, resolution of the issue we face is dependent upon the facts of the case. *United States v. Stallworth,* 543 F.2d 1038, 1039 (2d Cir.1976); 40 Am.Jur.2d 830. We hold that under the circumstances present in the case now before us, the appellant's conviction of attempted murder can be sustained. We have found no military or federal precedent which we believe would require us to reach the opposite conclusion.

As this Court has recently stated, "a criminal attempt attaches culpability to a state of mind consisting of an accused's criminal intent and the belief that he is acting in such a manner as to achieve that intent." *United States v. Guevara,* 26 M.J. 779, 781 (A.F.C.M.R.1988). In *United States v. Byrd,* 24 M.J. 286, 290 (C.M.A. 1987), the United States Court of Military Appeals relied upon a test adopted by the United States Court of Appeals for the Second Circuit:

> [T]o be guilty of an attempt, a 'defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime' and that '[a] substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.' *United States v. Jackson,* 560 F.2d 112, 116 (2d Cir.), *cert. denied,* 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977); *see also United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir.1974), *cert. denied* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975); ALI Model Penal Code, Sec. 5.01 (1962).

*See also United States v. Stallworth,* 543 F.2d 1038 (2d Cir.1976); *United States v. Thomas,* 13 U.S.C.M.A. 278, 32 C.M.R. 278, 285–286 (1962). The Court of Military Appeals most recently affirmed reliance upon this test in *United States v. Hyska,* 29 M.J. 122 (C.M.A.1989)—but the Court did not apply the test to the facts of the case as it was decided on other grounds. *See also United States v. Presto,* 24 M.J. 350 (C.M.A.1987).

In *Mandujano,* an informant introduced an undercover narcotics agent to the defendant. After some general conversation, the subject turned to drugs. The agent said he was from out of town, and was looking for an ounce sample of heroin to determine the quality of the material in the local area. Mandujano replied that he could get good brown Mexican heroin for $650.00 an ounce. He indicated he had a good contact, but would need the money up front. The agent gave Mandujano $650.00, and he departed. He returned about an hour later, explained that he was unable to locate his contact, and gave the money back to the agent. The Court found that the request for and receipt of the $650.00 from the agent constituted "a substantial step toward distribution of heroin." *United States v. Mandujano,* 499 F.2d at 379. Thus, the jury's verdict of guilty of an attempt to distribute heroin in violation of 21 U.S.C. § 846 was upheld. The Court, noting that the statute did not define an "attempt," assessed the case law and concluded that in order to constitute a criminal attempt, the defendant must have (1) acted "with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting," and, (2) "engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent." *Id.* at 376–377. This test was derived in large part from the Model Penal Code standard.[7]

---

**7.** Section 5.01 of the ALI Model Penal Code addresses criminal attempt. It provides in part:
(3) *Conduct Designed to Aid Another in Commission of a Crime.* A person who en-

gages in conduct designed to aid another to commit a crime which would establish his complicity under Section 2.06 if the crime were committed by such other person, is

*United States v. Jackson, supra,* involved an attempted bank robbery. The Court examined various approaches taken in an effort to distinguish preparation from attempt, and then affirmed the trial court's use of the *Mandujano* test. The Court noted that once criminal intent is established, the key question remaining is "the substantiality of the steps taken ... and how strongly this corroborates the firmness of ... [the] obvious criminal intent." 560 F.2d at 120. This determination is a matter of degree, and a mixed question of law and fact.

As noted above, the Court of Military Appeals applied the *Mandujano/Jackson* test in *United States v. Byrd, supra.* Byrd met SP4 Calloway (who was a drug suppression team member, though Byrd did not know this at the time) at the Community Center on Fort Gordon, Georgia. After some general conversation, Byrd mentioned something about marijuana. Calloway asked Byrd if he could get some marijuana for him. Byrd said he knew someone who could get him a five dollar bag for ten dollars. Byrd attempted to contact a certain taxi cab driver for this purpose, but found out he was not working that day. He told Calloway to meet him at the Community Center the following day. When they met, Calloway was accompanied by an undercover military police investigator who was posing as an individual interested in obtaining drugs. Byrd took them to another location on post and introduced them to the cab driver Byrd knew. The cab driver told them he could get marijuana for them for ten dollars. The investigator then gave Byrd ten dollars. It was agreed that Byrd would meet the investigator at the Community Center in half an hour with the marijuana. The cab driver then took Byrd to an off-post liquor store where marijuana was sold. The stipulation of fact in this guilty plea case provided: "The accused purchased a bottle of liquor with the money ... [the investigator] gave him because he was afraid he'd be caught if he tried bringing marijuana back on

post." During the providence inquiry, Bryd explained that on the way to the liquor store he decided not to purchase any marijuana. He did not want to get a reputation as a drug peddler.

Based upon these facts, the Court of Military Appeals found that Byrd's guilty plea to attempted distribution of marijuana was improvident. Receipt of $10.00 from the undercover agent and traveling to a liquor store where marijuana could be purchased did not constitute conduct going beyond preparation. The Court concluded:

> Riding to the liquor store with the other occupants of the taxi-cab was not 'strongly corroborative of the firmness of' Byrd's intent to distribute marijuana. The act is simply too ambiguous; and too many other steps remained before the distribution could be consummated.

*United States v. Byrd,* 24 M.J. at 290. We believe that Byrd's renunciation of his criminal purpose was an important factor to the outcome in his case. Chief Judge Everett, writing for the Court, discussed the principle of renunciation and the defense of voluntary abandonment in some detail. *Id.* at 290–293.

In *United States v. Presto, supra,* the accused, pursuant to his pleas, was found guilty of the attempted sale of three kilograms of marijuana. He had previously sold over 500 grams of marijuana to two acquaintances, one a confidential source, the other an undercover agent. They asked if he could get them an additional ten kilograms. He agreed to try to do so, but told them he doubted he could get more than two or three kilograms. He contacted the people he had dealt with, who indicated they would try to get the ten kilograms. A couple days later he contacted them again, but they did not have it yet. Later that day he was arrested. The Court stated: "Although placing a call to a potential source in order to determine the availability of drugs tends to corroborate appellant's criminal intent, we are unconvinced that the statutory requirement of 'more than

---

guilty of an attempt to commit the crime, although the crime is not committed or attempted by such other person.

Section 2.06 deals with liability for conduct of another.

mere preparation' has been met." *United States v. Presto,* 24 M.J. at 352. The Court relied upon the test adopted in *Byrd* in reaching this conclusion. In the case now before us, the appellant's acts far exceed those of the accused in *Byrd* and *Presto.*

### Conclusion

Applying the test adopted in *Byrd* and the principles set forth in the Manual (MCM, Part IV, para. 4 (1984)), we are convinced that the trial court's findings of guilty of the offense of attempted murder should be upheld. *See also* Article 66(c), UCMJ. The appellant's conduct in obtaining the services of Nicholas Karnezis to murder his wife, his detailed participation in planning the intended crime, up to advising the agent exactly how he wanted his wife shot, and his payment of the agreed upon consideration, both before the crime was to occur and after he was apprised that it had, constitutes "a substantial step toward commission of the crime," and establishes the requisite overt act amounting to more than mere preparation. We can envision nothing else the appellant could possibly have done to effect what he believed would be his wife's murder, short of committing the act himself (which is precisely what he did not want to do). As characterized by appellate government counsel during oral argument, the appellant armed a missile (Nick) and fired it off, fully believing it was aimed directly at his intended victim. *See United States v. Keenan,* 18 U.S.C.M.A. 108, 39 C.M.R. 108, 113 (1969). Or, using an example contained in the Manual: "if A, without justification or excuse and with intent to kill B, points a gun at B and pulls the trigger, A is guilty of attempt to murder, even though, unknown to A, the gun is defective and will not fire." MCM, Part IV, para. 4c(3) (1984). If we were to accept the reasoning of appellate defense counsel— "neither appellant nor SA Karnezis ever

took any steps or perpetration in dangerous proximity to the commission of the offense planned" because the agent never intended to commit the offense—no contract for hire criminal scheme could ever be prosecuted as an attempt if the person hired turned out to be a government agent or informant. *Cf. United States v. Johnson,* 7 U.S.C.M.A. 488, 22 C.M.R. 278, 283 (1957). To place our criminal justice system in this posture defies logic. It is the accused's criminal intent we are concerned with, not that of the person hired to commit the crime. *United States v. Guevara, supra.*

Turning to that intent, we find the record replete with evidence establishing "conduct strongly corroborative of the firmness of the defendant's criminal intent." The appellant retained whom he believed to be a big city hit man for the purpose of murdering his wife; he paid an agreed upon amount of money up front; he provided photographs, documents and diagrams to facilitate commission of the crime; he helped plan precisely how it would be committed; he indicated the need for an alibi for himself; after being advised that his wife had moved, he agreed to an increase in the contract price and obtained her new telephone number; when notified of her murder through unit channels, he "put on a Class A act;" upon being shown a staged picture of his wife with gun shot wounds, he commended Nick for his "good work," and paid a further installment on the contract price. The firmness of his intent is clearly established.[8]

We are convinced beyond a reasonable doubt that the appellant is guilty of attempted murder. We further find the sentence to be appropriate for commission of this crime. Our attention has also been invited to issues raised at trial which centered around the composition of the court panel. We find them to be without merit.

---

**8.** The defense theory at trial was that Senior Airman Church was a peaceful, happy-go-lucky individual, hurting from a difficult divorce, who fell victim to an OSI machine. His counsel forcefully argued this position on his behalf. "This machine was used to scare, intimidate, and overwhelm Airman Church to go along with the plan that was designed and created by the OSI. The situation was induced. They created an offense where there never was one." The military judge provided the members proper instructions on the defense of entrapment. By their findings, the jury determined this defense did not exist. We agree.

*Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *United States v. Smith,* 27 M.J. 242, 250 (C.M.A.1988); *United States v. Cunningham,* 21 M.J. 585 (A.C.M.R.1985), *pet. denied,* 22 M.J. 275 (C.M.A.1986); *United States v. Townsend,* 12 M.J. 861 (A.F.C.M.R.1981); Article 25, UCMJ, 10 U.S.C. § 825; R.C.M. 502(a)(1), 503(a)(1).

 One other matter warrants brief comment. As noted early on in this opinion, the attempted murder specification alleged that the crime occurred "at Grand Forks Air Force Base," yet the evidence established that the two meetings between the appellant and Nick took place in a motel room in Fargo, North Dakota, a distance of some 78 miles from Grand Forks, North Dakota, where the base is located. Additionally, the dates alleged in the specification were on or about 25–26 April 1988, but the key meeting between Nick and the appellant where plans for this crime were made occurred on 22 April. We do not find these to be fatal variances between pleadings and proof. The companion attempted conspiracy charge dismissed by the military judge alleged that the offense occurred between 19–22 April 1988 at both Grand Forks Air Force Base and Fargo. Clearly, the appellant was in no way misled so as to affect his ability to adequately prepare for trial, and he will be fully protected against another prosecution for the same offense. Therefore, there is no prejudice. *United States v. Lee,* 1 M.J. 15 (C.M.A.1975); *United States v. Rath,* 27 M.J. 600 (A.C.M.R.1988); *United States v. Mendoza,* 18 M.J. 576 (A.F.C.M.R.1984).

The findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

Senior Judges LEWIS and KASTL concur.

Senior Judge LEWIS took final action on this case prior to his retirement.