# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————————

## No. ACM 40511

————————————————

### UNITED STATES
*Appellee*

**v.**

### Cassius A. MORENO
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————————

Appeal from the United States Air Force Trial Judiciary

Decided 19 May 2025

————————————————

*Military Judge*: Jacquelyn M. Christilles.

*Sentence*: Sentence adjudged 11 May 2023 by GCM convened at Joint Base San Antonio-Fort Sam Houston, Texas. Sentence entered by military judge on 27 July 2023: Dishonorable discharge, confinement for 3 months, reduction to E-1, and forfeiture of all pay and allowances.

*For Appellant*: Major Trevor N. Ward, USAF; Jonathan W. Crisp, Esquire.

*For Appellee*: Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Jocelyn Q. Wright, USAF; Captain Morgan L. Brewington, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, DOUGLAS, and PERCLE, *Appellate Military Judges*.

Judge DOUGLAS delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge PERCLE joined.

————————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————————

DOUGLAS, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of attempted sexual assault of a child, in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[1] The court members sentenced Appellant to a dishonorable discharge, confinement for three months, reduction to the grade of E-1, and forfeiture of all pay and allowances.[2] The convening authority took no action on the findings or the sentence.

Appellant raises three issues on appeal which we have rephrased: whether (1) Appellant's conviction is legally and factually insufficient; (2) the trial judge abused her discretion by admitting evidence that Appellant stated he assumed he was going to "prison" after being apprehended; and (3) the trial counsel committed prosecutorial misconduct during argument. During our Article 66(d), UCMJ, 10 U.S.C. § 866(d), review, we also considered issue (4) timely appellate review.

We find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

Appellant was a member of the regular Air Force, assigned to Joint Base San Antonio (JBSA)-Lackland Air Force Base (AFB), Texas. On 2 August 2022, Appellant initiated online communications with a person identified as "Kelly." "Kelly" had posted a message on a social media application that indicated she had just moved to JBSA-Lackland AFB and was looking to make local friends. Unbeknownst to Appellant, "Kelly" was a Navy Criminal Investigative Service (NCIS) Special Agent (SA). This agent, SA GM, was posing as a 14-year-old girl as part of an undercover law enforcement investigation designed to catch sexual offenders. Appellant responded to "Kelly's" message by asking her what she liked to do. By the next day, 3 August 2022, they exchanged their purported ages, personal telephone numbers, and their conversation moved from the social media application to personal text messages. Their electronic communications continued for the next eight days, during which time Appellant discussed getting together to hang out and drink alcohol. Additionally, Appellant discussed sex. On 7 August 2022, Appellant called "Kelly," but "Kelly" did not answer. When "Kelly" later asked why he called, Appellant explained that he

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The Statement of Trial Results (STR) and the entry of judgment (EoJ) describe this part of the sentence as "Forfeitures of Pay and/or Allowances: Total." Appellant claims no prejudice from this irregularity, and we find none.

did not remember specifically, but said that when he gets drunk, he calls people "to f[**]k." On 8 August 2022, Appellant asked "Kelly" about sneaking out at night to meet up. When "Kelly" asked why, Appellant explained, "for the same reason I call people at night."

On 10 August 2022, Appellant arranged to meet "Kelly" at a residential location on JBSA-Lackland AFB. "Kelly" advised she was not on birth control and asked if he would "bring anything . . . lol." Appellant responded that he would bring protection. Appellant, who lived off-base, about a 20-minute drive from JBSA-Lackland AFB, then drove to the agreed upon location. After arriving, he slowed his vehicle and nearly stopped at the intersection to the cul-de-sac where he was to meet "Kelly." At that time, he was apprehended by law enforcement. Appellant had three cans of malt liquor in his vehicle, and a condom. Appellant admitted his plan was to pick up "Kelly," park somewhere, drink alcohol, and see if she would let him have sex with her.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant asserts that the evidence was legally and factually insufficient to overcome the deficiency in proof of his specific intent to commit the offense. Appellant also argues that the Government failed to demonstrate that the defenses of entrapment and voluntary abandonment did not apply. We are not persuaded by Appellant's arguments and find his convictions both legally and factually sufficient.

#### 1. Additional Background

##### a. Specific Intent

Appellant testified under oath, in his defense. Appellant testified it was not his "intent to have sex with 'Kelly.'" Instead, he explained, he just wanted to meet her and see if she was "real." Although he had previously offered to meet "Kelly" during his lunch break, "Kelly's" mom came home during that time, so he did not offer to meet her again over his lunch break. On cross-examination, Appellant could not answer why he needed "Kelly" to sneak out of her house after midnight, nor explain why he came prepared with alcohol and a condom if he only intended to meet her to verify that she was a real person.

##### b. Defense of Entrapment

As described *supra*, Appellant responded to the social media post by "Kelly," and was immediately told by "Kelly" that she was a 14-year-old girl. Appellant also told "Kelly" early in their communications that he was 23 years old. Although Appellant and "Kelly" exchanged photographs of each other's

faces, Appellant never requested, sent, or received sexually explicit photos. Similarly, Appellant did not discuss having sex with "Kelly" in graphic detail.

Appellant did, however, guide the conversation. First, he sought to obtain information about "Kelly's" parents:[3]

> [Appellant:] Also is your dad or mom in the military?
>
> ["Kelly":] My mom is….theres no dad in the picture….
>
> [Appellant:] And I'm sorry that's my bad. What does she do though?
>
> ["Kelly":] she's in the navy….
>
> [Appellant:] Oh then I'll definitely never see her haha

After learning "Kelly" had only one parent in the home, and that her mother served in the United States Navy, Appellant guided the conversation to learn about the frequency of her mother's presence in the home:

> [Appellant:] Does she have to leave often?
>
> ["Kelly":] sometimes….she just got back yesterday after being gone for a week…
>
> [Appellant:] Does she just leave you by yourself? Lol
>
> ["Kelly":] ha! I wish:)
>
> [Appellant:] Lol why?
>
> ["Kelly":] well she basically does:)
>
> [Appellant:] oh okay does someone just check on you or something? And you live on base?
>
> ["Kelly":] yes and yes….

Next, Appellant broached the subject of providing "Kelly" with alcohol:

> [Appellant:] The downtown area is really only cool if you can drink hah a
>
> ["Kelly":] unfortunately wouldn't know much about that :) Ive drank a little bit tho..lol
>
> [Appellant:] Oh yeah true. Maybe you can drink more later haha
>
> ["Kelly":] right….do you drink?

---

[3] Text message exchanges are taken verbatim from evidence introduced at trial and include misspellings and punctuation errors.

[Appellant:] Yeah I do sometimes at night

["Kelly":] cool!

[Appellant:] If we become friends I'll get you something eventually haha

Appellant then steered the conversation to "Kelly's" willingness to associate with him, as an "older" person:

[Appellant:] Oh you're lookin for people to hang out with right? How are you gonna do that with older people? Lol

["Kelly":] what do you mean:)

[Appellant:] Like is your mom cool with you going out and stuff?

["Kelly":] shes not home a lot and gives me a lot of freedom

[Appellant:] Ohhh okay so you can do what you want really

["Kelly":] yup…haha

Finally, Appellant broached the subject of meeting with "Kelly" in person:

[Appellant:] But no I live like 20 minutes from the base. Not super far

["Kelly":] nice u can drive….

[Appellant:] Yes I can visit you haha

["Kelly":] haha…just no drama:)

[Appellant:] Yeah of course. No drama and nothing weird haha

["Kelly":] nothing weird….good:) lol

Appellant then asked about where "Kelly" lived on JBSA-Lackland AFB:

[Appellant:] Which little neighborhood do you live in?

["Kelly":] Im close to [a named] park…where do you work on base?

[Appellant:] I don't know which parks are what haha

But I'm on the other side of the bridge. The training side not the house side

They exchanged photos of their faces.[4] Appellant asked "Kelly" to meet up during his lunch break. He said at lunch he just "chill[s]" in his car and takes a nap. He described his backseat as "spacious."

---

[4] SA GM used an altered image portraying a smiling young teenage girl.

Guiding the conversation towards sex, Appellant asked "Kelly,"

[Appellant:] What would you want to do if we hung out?

["Kelly":] what would u wanna do:)

Initially, Appellant claimed he only wanted to "drink a little with someone and vibe." Appellant explained to "Kelly" that "vibe" meant to "[j]ust hang out and chill and talk haha[.]" They discussed "Kelly" sneaking out of the house. And they began to discuss when they might meet up.

Later, in response to a question from "Kelly" about why Appellant was texting her so late at night, Appellant responded:

[Appellant:] Idk. I knew you couldn't but I like to hang out at night haha

In response to a question from "Kelly" about where Appellant would want to hang out, Appellant responded:

[Appellant:] Anywhere you want. In the car probably though.

"Kelly" described herself as "shy" and explained that was why she went on the social media site because "everyone seemed to be direct."

[Appellant:] Yeah but everyone on [the social media site] tries to skip directly to sex lol

. . . .

["Kelly":] So why are you on [the social media site]…haha

[Appellant:] Sometimes for the same thing but usually just for people to talk to

After several more exchanges about meeting up, hanging out in Appellant's vehicle, and drinking alcohol, Appellant called "Kelly." "Kelly" did not answer. Later in the day, Appellant texted:

[Appellant:] Don't ever get too drunk bc when you do you start calling people bc all you want to do is f[**]k  lmao

On 7 August 2022, five days since their first communication, Appellant asked "Kelly" to send a picture holding up three fingers "for confirmation," which she did.

On 8 August 2022, as they were solidifying plans to meet, "Kelly" asked:

["Kelly":] What would u wanna do?

[Appellant:] Just hang out. Have fun ;)

["Kelly":] And how do u wanna have fun…lol

[Appellant:] Guess lol

["Kelly":] Gove me a clue and I will:)

[Appellant:] The reason I call people at night haha

["Kelly":] Oh…haha…how would u wanna do it? Do you have protection?

[Appellant:] Yeah of course haha

On 9 August 2022 the conversation continued with innuendos. "Kelly" asked if Appellant meant what he had said. Appellant replied, "Oh no I meant it don't worry haha."

On 10 August 2022, they agreed to meet later that night, after midnight. They discussed Appellant bringing alcohol and the name of the street on JBSA-Lackland AFB where they would meet. "Kelly" let Appellant know that she was "not on birth control" and asked if he "would bring anything…lol[.]" Appellant replied, "Yes lol[.]"

### c. Defense of Voluntary Abandonment

Early on 11 August 2022, Appellant drove to the area where "Kelly" lived on JBSA-Lackland AFB, just as they had planned. "Kelly" indicated that she would be watching from inside her house, and advised Appellant to drive slowly down the street, which ended in a cul-de-sac. "Kelly" would then walk out of her house and meet Appellant at his vehicle, which he had described to her as a gray sedan. He did not otherwise know which house "Kelly" was going to be walking out of as she did not provide a house number. Appellant arrived in the area and drove slowly down the street which intersected "Kelly's." While driving slowly, he passed her street entrance twice, turning around in cul-de-sacs at either end of the intersecting street. Several law enforcement agents were divided amongst three unmarked parked vehicles. One unmarked vehicle, a larger, dark-colored sport utility vehicle (SUV), caught Appellant's attention. Appellant slowed his vehicle even more and lingered around that unmarked vehicle. SA GM became concerned that the agents inside this vehicle had been discovered. As the lead agent, he made the decision to apprehend Appellant at that time, instead of waiting to see if Appellant would drive down "Kelly's" street.

Appellant explained in his interview with law enforcement after apprehension why he lingered around the vehicle in question:

[SA GM:] What were you looking for?

[Appellant:] The car looked weird.

[SA GM:] What car?

[Appellant:] The [Office of Special Investigations (OSI)] car.

[SA GM:] Which one?

[Appellant:] The big SUV.

[SA GM:] Okay. So, you kind of just [sic] feeling the place out before you turned down the [street]?

[Appellant:] Mm-hm.

[SA GM:] You got afraid – you got concerned when you saw that SUV?

[Appellant:] Mm-hm.

[SA GM:] So, what was your next step before we came out and stopped you?

[Appellant:] I was going to leave.

While answering questions from law enforcement, Appellant agreed to write a signed sworn statement. He did not include information pertaining to an attempt to leave the pick-up location. The entire statement reads as follows:

> On the morning of August 11[,] 2022[,] I was detained for attempting to meet a minor. This is a statement to let you know as my commander exactly what is going on and my side of things. I admit my attempt to try to meet this minor while having alcohol and a condom with me. It is obviously my worst mistake and one I was very unsure of making. Even with my uncertainty, I still attempted to follow through and was stopped and detained by the federal agents. I am still unsure of why I went through with this and regret it deeply. As you know my character and judgment has not been the best[,] so I understand any judgment coming from you. I live an okay life and there was no real reason to do something like this except out of pure stupidity. I am uncertain of my future but just know that this is not who I truly am and does not reflect my character. I am better than this and I know I am. I will get through this as gracefully as possible. I will take full accountability for my actions as I always have.

At trial, Appellant testified under oath, in his defense. He testified he did not want to "carry through" with the plan to meet "Kelly." When it came time to turn down her street, he explained, "[A]t that point, it became real to me, that – what I had planned to do, and I just couldn't bring myself to do it." He disavowed seeing any suspicious vehicles parked on the street. However, he admitted he had told the interviewers that he saw a vehicle that looked "weird."

> [Trial Defense Counsel (DC):] Why did that vehicle look weird to you?

[Appellant:] It was an SUV, and it was the only vehicle in the cul-de-sac at the time and it was kind of large. So, like, when I was driving past, it kind of hindered my path.

[DC:] . . . [Was] it a large cul-de-sac?

[Appellant:] No, it was pretty small.

[DC:] And so, was this vehicle kind of in your way?

[Appellant:] Yes, sir. It was.

[DC:] And when you saw that vehicle, did you think it was law enforcement?

[Appellant:] No, Sir.

[DC:] Did you happen to see anyone in that vehicle?

[Appellant:] No, Sir.

[DC:] Did you happen to – I guess, were you looking for anyone to be in that vehicle?

[Appellant:] No, Sir.

. . . .

[DC:] Did you ever decide to leave [the pick-up area]?

[Appellant:] Yes, sir, I did.

[DC:] Where were you going to go?

[Appellant:] I was ready to go back home.

[DC:] Why?

[Appellant:] I just wanted to end the night while I still could with my last bit of dignity.

### 2. Law

#### a. Standards of Review

We review questions of legal sufficiency de novo. *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). We review questions of factual sufficiency when an appellant asserts an assignment of error and shows a specific deficiency in proof. *United States v. Harvey*, 85 M.J. 127, 129 (C.A.A.F. 2024) (citing Article 66(d)(1)(B), UCMJ, 10 U.S.C. § 866(d)(1)(B)). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

#### b. Tests for Legal and Factual Sufficiency

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

Article 66(d)(1), UCMJ, provides:

> (B) FACTUAL SUFFICIENCY REVIEW.
>
>> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.
>>
>> (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>>
>>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>>>
>>> (II) appropriate deference to findings of fact entered into the record by the military judge.
>>
>> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*). The factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. *See* The National Defense Authorization Act

for Fiscal Year 2021, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3388, 3612–13 (1 Jan. 2021).

The requirement of "appropriate deference" when a CCA weighs the evidence and determines controverted questions of fact "depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. 127, 130. This court has discretion to determine what level of deference is appropriate. *Id.* "[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at 131 (internal quotation marks omitted). For this court "to be clearly convinced that the finding of guilty was against the weight of the evidence, two requirements must be met." *Id.* at 132. "First, [we] must decide that the evidence, as [we] weighed it, does not prove that the appellant is guilty beyond a reasonable doubt. Second, [we] must be clearly convinced of the correctness of this decision." *Id.* (emphasis omitted). "[T]he factfinder at the trial level is always in the best position to determine the credibility of a witness." *United States v. Peterson*, 48 M.J. 81, 83 (C.A.A.F. 1998).

### c. Attempted Sexual Assault of a Child

In order to convict Appellant of attempted sexual assault of a child as charged in this case, the Government was required to prove that at or near San Antonio, Texas, between on or about 10 August 2022 and on or about 11 August 2022: (1) Appellant did certain overt acts; (2) that the acts were done with the specific intent to commit the offense of sexual assault of a child who has attained the age of 12, "Kelly," in violation of Article 120b, UCMJ, 10 U.S.C. § 920b; (3) that the acts amounted to more than mere preparation; and (4) that such acts apparently tended to bring about the commission of the offense. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 4.b. The requisite overt act must go beyond preparation, which "consists of devising or arranging the means or measures necessary for the commission of the offense." *MCM*, pt. IV, ¶ 4.c.(2). The law requires that there be a "direct movement toward the commission of the offense." *Id.* Thus, "[t]he overt act required goes beyond preparatory steps and is a direct movement toward the commission of the offense." *Id.* However, "[t]he overt act need not be the last act essential to the consummation of the offense . . . . for the combination of a specific intent to commit an offense, plus the commission of an overt act directly tending to accomplish it, constitutes the offense of attempt." *Id.*

Sexual assault of a child who has attained the age of 12, in violation of Article 120b, UCMJ, requires the prosecution to show that (1) "the accused committed a sexual act upon a child;" and (2) "at the time of the sexual act the child had attained the age of 12 years but had not attained the age of 16 years."

11

*MCM*, pt IV, ¶ 62.b.(2). In relevant parts, sexual act is defined as "the penetration, however slight, of the penis into the vulva or anus or mouth." *MCM*, pt. IV, ¶ 60.a.(g)(1).

Finally, "[f]ailure to complete the offense, whatever the cause, is not a defense." *United States v. Church*, 29 M.J. 679, 681 n.2 (A.F.C.M.R. 1989), *aff'd*, 32 M.J. 70 (C.M.A. 1991). Thus, at the time of the acts, Appellant must have intended every element of the attempted offenses. *See United States v. Talkington*, No. ACM 37785, 2013 CCA LEXIS 357, at *11 (A.F. Ct. Crim. App. 26 Apr. 2013) (unpub. op.), *aff'd*, 73 M.J. 212 (C.A.A.F. 2014) (upholding conviction for attempted sexual assault where the victim "was only pretending to be asleep . . . [because t]he Government was not required to prove [she] was *actually* unable to decline participation[;]" rather, it only had "to prove that, when the appellant committed the acts, *he believed* [she] was unable to decline participation").

### d. Various Defenses

### i) Entrapment

Entrapment "is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." Rule for Courts-Martial 916(g). As it is an affirmative defense, the defense has the initial burden of showing some evidence that an agent of the Government "originated the suggestion to commit the crime." *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002) (quoting *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992)). The defense's burden of proof for affirmative defenses, including entrapment, is "by a preponderance of the evidence." *See United States v. Feliciano*, 76 M.J. 237, 239 n.1 (C.A.A.F. 2017) (citations omitted). Once the defense meets its burden, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense . . . ." *Hall*, 56 M.J. at 436 (citation omitted).

"[T]he first element of entrapment is an inducement by government agents to commit the crime." *Hall*, 56 M.J. at 436 (first citing *United States v. Howell*, 36 M.J. 354, 359–60 (C.M.A. 1993); then citing *United States v. Stanton*, 973 F.2d 608, 610 (8th Cir. 1992)). "Inducement" means more than merely providing an appellant the means or opportunity to commit a crime. *Howell*, 36 M.J. at 360 (citations omitted). Instead, the Government's conduct must

> create[ ] a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense. Inducement may take different forms, including pressure, assurances that a

person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.

*Id*. at 359–60 (emphasis, internal quotation marks, and citations omitted).

The second element of entrapment is "the absence of predisposition on the part of the defendant." *Id.* at 358 (quoting *United States v. Skarie*, 971 F.2d 317, 320 (9th Cir. 1992)). "A defendant may raise the defense by showing that the Government's evidence reveals *some inducement* and *some reluctance* on the part of the defendant." *Id.* at 359 (quoting *United States v. Gunter*, 741 F.2d 151, 153 (7th Cir. 1984)). Notably, to make this showing, "[t]here is no requirement that a defendant testify or produce witnesses." *Id.* (citation omitted). However, "[w]hen a person accepts a criminal offer without . . . extraordinary inducement[ ] to do so, he demonstrates a predisposition" to commit the crime in question. *Whittle*, 34 M.J. at 208 (citations omitted).

Furthermore, the Government may use undercover agents and informants to ferret out crime and afford opportunities or facilities for criminals to act upon, without implicating the defense of entrapment. *Howell*, 36 M.J. at 358 (quoting *Jacobson v. United States*, 503 U.S. 540, 548 (1992)); *see also Whittle*, 34 M.J. at 209 (citations omitted) (finding that rather than inducing appellant to break the law, the Government "merely afforded [appellant] 'the opportunity to' commit the offense"). Thus, "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932) (footnote and citations omitted); *see also United States v. Russell*, 411 U.S. 423, 435–36 (1973) (finding that "entrapment is a relatively limited defense," in part because "there are circumstances when the use of deceit is the only practicable law enforcement technique available"); *Howell*, 36 M.J. at 358 (quoting *Jacobson*, 503 U.S. at 549–50) (observing that law enforcement officers may pretend to be someone other than government agents when conducting "sting" operations).

### *ii) Impossibility*

"[I]n military justice, impossibility—whether of law or fact—is no defense in a prosecution for conspiracy or attempt." *United States v. Valigura*, 54 M.J. 187, 189 (C.A.A.F. 2000) (citation omitted). Thus, "[a] person who purposely engages in conduct which would constitute the offense if the attendant circumstances were as that person believed them to be is guilty of an attempt." *MCM*, pt. IV, ¶ 4.c.(3).

### *iii) Voluntary Abandonment*

With respect to voluntary abandonment, "[i]t is a defense to an attempt offense that [appellant] voluntarily and completely abandoned the intended crime, solely because of [appellant's] own sense that it was wrong, prior to the

completion of the crime." *MCM*, pt. IV, ¶ 4.c.(4). "The voluntary abandonment defense is not allowed if the abandonment results, in whole or in part, from other reasons, for example, the person feared detection or apprehension, decided to await a better opportunity for success, was unable to complete the crime, or encountered unanticipated difficulties or unexpected resistance." *Id.*

### 3. Analysis

Viewing the evidence in the light most favorable to the Government, we conclude a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Further, we conclude the trier of fact could rationally find that the Government proved beyond a reasonable doubt that Appellant did not voluntarily abandon his intended crime. Moreover, we find the defense of entrapment was not reasonably raised by the evidence. Even if raised, we find the Government proved beyond a reasonable doubt that Appellant was not entrapped.

Applying the facts to the elements of the charged offense, here, a rational trier of fact could have determined that Appellant committed multiple overt acts. First, Appellant engaged in communications with a person he believed was a 14-year-old girl. In these communications, he determined the extent of parental involvement, her availability, and her willingness to participate in misbehavior to include leaving her mother's home without her mother's knowledge and drinking alcohol under the legal age limit. Second, Appellant indicated his specific intent to engage in sex with "Kelly" by suggesting he wanted to meet at night, while drinking alcohol, and unambiguously referencing his earlier comment that he texts people at night "to f[**]k." We also conclude that a rational trier of fact could have found that his acts amounted to more than mere preparation when he drove to the location that she specified for him on JBSA-Lackland AFB, arriving at a prearranged time with alcohol and a condom. Finally, despite his sworn testimony to the contrary, had "Kelly" been a real person, he had prepared to complete a sex act with "Kelly" in his car on 11 August 2022.

Beyond proving each element to meet the legal sufficiency of the offense, we find that viewing the facts in the light most favorable to the Government and drawing all reasonable inferences in favor of the Government, the defense of impossibility is not a defense to the charged offense. We find that although raised, the defense of voluntary abandonment was disproven beyond a reasonable doubt. We agree with the trial judge that defense of entrapment was not reasonably raised by the facts in this case. Therefore, the conviction is legally sufficient. *See Robinson*, 77 M.J. at 297–98.

As to the factual sufficiency of the same conviction, we decide Appellant's claims of deficiency are sufficiently specific for our analysis. We find Appellant's conviction for attempted sexual assault of a child factually sufficient.

Having compared Appellant's statements to law enforcement following his apprehension with those of his sworn testimony at trial, we are convinced Appellant saw the unmarked law enforcement vehicle and became concerned "Kelly" may not be a real person after all. Indeed, his actions demonstrate he feared detection or apprehension, which is why he prepared to depart the area. We are not persuaded by his sworn testimony on the stand at trial, as we find that testimony to be less reliable than his immediate actions and explanation to law enforcement. Nor do we find Appellant was entrapped. Appellant guided "Kelly" through hundreds of text messages for approximately 10 days, culminating in his apprehension on JBSA-Lackland AFB, after midnight, with alcohol and a condom, after suggesting "Kelly" sneak out of her mother's house to meet him in his car, which he described as having a "spacious" backseat. He had the specific intent and committed multiple overt acts, including seeking confirmation "Kelly" was a real person by asking her for a picture holding up three fingers. He knew her age from the outset and yet continued to seek time, place, and manner to meet. Notably, there was hardly discussion about anything else other than meeting for sex. We are clearly convinced Appellant drove his personal vehicle, where he had a condom and alcohol, for 20 minutes—from his home to the base—and was apprehended by law enforcement in the area where he had planned to meet "Kelly" for sex.

After weighing all the evidence and having given appropriate deference to the fact that the trial court saw and heard the witnesses, we find that the findings of guilty were not against the weight of the evidence and, therefore, are factually sufficient. *See Harvey*, 85 M.J. at 130.

**B. Evidence Appellant Assumed He Was Going to Prison**

Appellant submits the trial judge abused her discretion by improperly admitting evidence that Appellant stated he assumed he was going to prison after he was apprehended for the charged offense. Appellant argues the trial judge failed to properly apply Mil. R. Evid. 404(b), and the error was prejudicial. The Government submits that Mil. R. Evid. 404(b) does not apply to Appellant's statement and the trial judge did not abuse her discretion in applying Mil. R. Evid. 401, 402, and 403. We agree with the Government and find Appellant is not entitled to relief.

**1. Additional Background**

On 11 August 2022, towards the end of Appellant's interview with law enforcement, one agent asked him, "So, what do you think is going to happen [next]?" Appellant responded, "I assume prison."

On 2 May 2023, in accordance with Mil. R. Evid. 304(d), the Government provided notice of statements made by Appellant prior to trial. The following day, the Defense filed a motion to exclude most of the statements under Mil.

R. Evid. 304(d) and Mil. R. Evid. 404(b). On 8 May 2023, during the motions hearing, trial defense counsel maintained their multi-faceted objection to numerous statements made by Appellant to law enforcement, including Appellant's statement, "I assume prison." After listening to both parties' arguments on the Government's admission of this statement, the trial judge ruled, and explained:

> Okay. The final question is about, "What do you think will happen next? Prison." I think it falls squarely in the consciousness of guilt evidence category. I think that the danger of unfair prejudice can be cured with a limiting instruction. As such, I will permit that statement. I will give a limiting instruction during findings and during sentencing should we get there. Counsel, do you have any questions? Does that take care of everything?

The Defense replied, "I believe so at this time, ma'am." The Government responded, "Yes, ma'am. I think that's it."

During his trial, while testifying under oath, in cross-examination, Appellant explained what he meant by this statement, "Uh, I had no clue how it worked afterwards." When trial counsel asked him a second time why he made that statement, trial defense counsel objected. Before ruling on the objection, the trial judge turned to the members and instructed them:

> And, Members, at this point, to the extent that the accused said anything about any type of sentence, in his untrained legal mind, he may have gotten during an OSI . . . interview, you are to disregard that. With regard to whether or not we ever get to sentencing, if we should get there, we're still in the determination and findings [phase]. But you are to disregard that, as it may relate to anything involving what punishment would be appropriate.

Without receiving a ruling on the defense objection, trial counsel proceeded, "Did you say that you thought you were going to prison because you thought you were guilty?" Appellant responded, "No, sir. I said it because I was in their office, and I didn't know what the next step was afterwards."

In his closing argument, trial counsel argued Appellant's statement, "I assume prison," was evidence of consciousness of guilt, "because he knew at the time what he was doing was wrong, and he was only stopped because [the] law enforcement officer apprehended him and detained him."

**2. Law**

We review a military judge's decision to admit or exclude evidence for abuse of discretion. *United States v. Wilson,* 84 M.J. 383, 390 (C.A.A.F. 2024) (citing *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019)).

A military judge abuses her discretion (1) when "the findings of fact upon which [she] predicates [her] ruling are not supported by the evidence of record;" (2) if incorrect legal principles were used; or (3) "if [her] application of the correct legal principles to the facts is clearly unreasonable." *Id.* (citing *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010)).

"To reverse for an abuse of discretion involves far more than a difference in . . . opinion . . . . The challenged action must . . . be found to be arbitrary, fanciful, clearly unreasonable, or clearly erroneous in order to be invalidated on appeal." *Hyppolite*, 79 M.J. at 166 (omissions in original) (citation omitted).

Mil. R. Evid. 304(d) provides that trial counsel should disclose to trial defense counsel any statements by the accused which are known to the trial counsel, relevant to the case, and which the prosecution intends to offer at trial, generally contemplating admissibility of this type of evidence.

Mil. Rule of Evid. 401 and 402 generally provide that relevant evidence, that is evidence that "has any tendency to make a fact more or less probable than it would be without evidence," is admissible.

Mil. R. Evid. 403 provides that "[t]he military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence."

Mil. R. Evid. 404(b)(1) provides that evidence of a crime, wrong, or other act is generally not admissible as evidence of a person's character in order to show the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for another purpose, including, *inter alia*, to prove intent, knowledge, or absence of mistake. Mil. R. Evid. 404(b)(2). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989).

A military judge's rulings under Mil. R. Evid. 404(b) and Mil. R. Evid. 403 will not be disturbed "except for a clear abuse of discretion." *United States v. Morrison*, 52 M.J. 117, 122 (C.A.A.F. 1999) (citing *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)).

"Consciousness of guilt evidence is different from propensity evidence. Consciousness of guilt evidence is an acceptable form of circumstantial evidence used to show 'awareness of an accused that he or she has engaged in blameworthy conduct.'" *United States v. Quezada*, 82 M.J. 54, 59 (C.A.A.F. 2021) (quoting BLACK'S LAW DICTIONARY 379 (11th ed. 2019)). "By contrast, propensity evidence is a generally impermissible form of character evidence in which

members 'prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.'" *Id.* (quoting Mil. R. Evid. 404(b)(1)).

"The test for nonconstitutional error is whether the error had a substantial influence on the findings." *United States v. Adams*, 44 M.J. 251, 252 (C.A.A.F. 1996) (citing *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946)) (additional citations omitted). "We evaluate prejudice from the military judge's erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Moolick*, 53 M.J. 174, 177 (C.A.A.F. 2000) (internal quotation marks and citations omitted).

### 3. Analysis

We find the trial judge did not abuse her discretion in admitting Appellant's statement, that tended to show Appellant was aware he may go to prison because of being apprehended for his criminal conduct. Contrary to Appellant's argument that the military judge misapplied Mil. R. Evid. 404(b), Appellant's statement "I assume prison" is not propensity evidence; it is not evidence of a crime, wrong, or other act. Instead, it is an acceptable form of circumstantial evidence used to show Appellant's awareness that he has "engaged in blameworthy conduct." *Quezada*, 82 M.J. at 59. As such, we find that the trial judge in this case correctly considered the statement's relevance under Mil. R. Evid. 401 and 402, and conducted the proper balancing test under Mil. R. Evid. 403. We do not find the trial judge's ruling to be "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Hyppolite*, 79 M.J. at 166.

Even if we were to find that the trial judge abused her discretion by admitting this evidence, we find no prejudice to Appellant's substantial rights. Applying the *Moolick* four-part test, we determine the Government's case against Appellant was strong, and was centered on Appellant's text messages, actions, and admissions. By contrast, the defense case was not strong. Moreover, this statement, "I assume prison," was not particularly material, and its quality was low. In support of this conclusion, we note that this statement had no bearing on our legal and factual sufficiency review. Furthermore, Appellant explained, under oath, what he meant by that statement. Even if Appellant decided not to testify in his defense, this statement's quality would be considered low because the statement in and of itself did not compromise any defense Appellant could have put in front of the members. Finally, the trial judge gave a limiting instruction to the members. Thus, we conclude that, even if the trial judge erred, the error did not have a substantial influence on the findings. *Id.*

### C. Prosecutorial Misconduct

Appellant alleges that trial counsel committed prosecutorial misconduct in several ways. Appellant submits that trial counsel committed prosecutorial error by asking Appellant on cross-examination about a particular social media platform, a matter that the trial judge had previously ruled was inadmissible. Appellant also argues trial counsel erred during findings argument by offering his personal experience with the social media platform and by improperly shifting the Government's burden of proof.

**1. Additional Background**

*a. Inadmissible Evidence, a Social Media Platform*

During trial counsel's cross-examination of Appellant, the following exchange occurred:

> [Trial Counsel (TC):] In the same conversation, you told ["Kelly"] she should get a [particular social media account]. Is that correct?
>
> [Appellant:] Yes, sir.
>
> [TC:] And tell me how [the particular social media platform] works.
>
> [Appellant:] Basically, you can send pictures or text on it and once you've sent them —
>
> [Trial Defense Counsel:] Your Honor, I am going to object to relevance.
>
> [TC:] Again, Your Honor, it goes to criminal intent. He's talking in the text messages about having her get [a particular social media account].
>
> [Trial Judge:] I don't think [that particular social media platform] was used in this case, correct?
>
> [TC:] That is correct, Your Honor.
>
> [Trial Judge:] Okay. I'm going to sustain that objection.

During trial, the Government had admitted Prosecution Exhibit 2, which was an 11-page exhibit that included several text message exchanges. Appellant made a brief reference to this social media platform when asking "Kelly" if she had an account on it. Similarly, the Government also admitted Prosecution Exhibit 5, which was a 28-page exhibit including hundreds of text message exchanges. In those messages, Appellant again made brief references to this platform. The references to this social media platform found in these exhibits were not redacted. Trial defense counsel did not object to these references being admitted at trial through these exhibits, nor does Appellant object on appeal.

### *b. TC's Personal Experience*

During his closing argument in findings, trial counsel briefly mentioned this platform and asked the members to consider why Appellant would be suggesting using a platform with a feature that automatically deletes messages and pictures. He briefly continued and said that he personally did not have an account, but suggested that for his job, he encountered young Airmen who have this platform. Trial defense counsel objected to trial counsel's argument proclaiming that the Government did not have the facts in evidence. The trial judge sustained the objection, and the trial counsel did not mention the platform further.

### *c. Burden-Shifting in Argument*

Later, in the same argument, when discussing Appellant's sworn testimony, as compared with Appellant's statements to law enforcement the night of his apprehension, trial counsel characterized those statements as something "that he can't disprove." The trial defense counsel immediately objected, claiming it was "burden shifting." Before the trial judge could rule, trial counsel apologized and said he did not "mean it in that context." The trial judge sustained the objection and instructed the members to disregard the statement. The trial judge further instructed the members that "the burden never shifts to [Appellant]."

### 2. Law

We review prosecutorial misconduct and improper argument de novo. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). "If proper objection is made, we review for prejudicial error." *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018). If we find error we then determine "whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Voorhees*, 79 M.J. at 9 (internal quotations marks and citations omitted). In analyzing prejudice, we consider: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

"Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citations omitted). A prosecutor's interest "in a criminal prosecution is not that [the Government] shall win a case, but that justice shall be done." *Fletcher*, 62 M.J. at 179 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

"[A]rgument by a trial counsel must be viewed within the context of the entire court-martial. The focus of [the] inquiry should not be on words in isolation, but on the argument as 'viewed in context.'" *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)) (additional citations omitted). In performing our review, "it is improper to 'surgically carve' out a portion of the argument with no regard to its context." *Id.*

> Appellate judges must exercise care in determining whether a trial counsel's statement is improper or has improper connotations. The [United States] Supreme Court has emphasized that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."

*United States v. Palacios Cueto*, 82 M.J. 323, 333 (C.A.A.F. 2022) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, (1974)). Thus, "[a] statement that might appear improper if viewed in isolation may not be improper when viewed in context." *Id.* (citing *Donnelly*, 416 U.S. at 645).

### 3. Analysis

On appeal, Appellant submits that trial counsel committed prosecutorial misconduct: first, in his questions to Appellant on cross-examination where he referenced how a particular social media platform worked; second, during his findings argument by offering his personal experience on the same platform; and finally, during findings argument by suggesting Appellant could not "disprove" his statements provided to law enforcement on the night he was apprehended when he admitted he was suspicious of an unmarked law enforcement vehicle. In this last instance, trial counsel was arguing Appellant had made an inconsistent statement on the witness stand when he claimed he voluntarily abandoned his criminal plan to have sex with an underage female.

#### a. Social Media Platform

We begin our analysis by noting that we find nothing in the record to support Appellant's argument that trial counsel was prohibited from discussing the particular social media platform. In fact, the name of this particular social media application appears multiple times in both Prosecution Exhibit 2 and Prosecution Exhibit 5. Therefore, we find no error in trial counsel referencing this social media platform in his question to Appellant. Here, trial defense objected to trial counsel asking Appellant to explain how this particular social media platform works. The trial judge concluded that the information was not relevant to Appellant's case and sustained the objection. No other questions were asked. That said, even if we were to assume error for asking the question,

Appellant cannot demonstrate that he was prejudiced by this question. Applying the *Fletcher* analysis, here the trial counsel asked one question, during a lengthy cross-examination, that referenced the name of the social media platform. Trial counsel's question was immediately objected to and that objection was sustained by the trial judge. If there is error, we find the misconduct here to be minimal, and the trial judge's efforts to cure the misconduct to be adequate. In support of this conclusion, we again note that references to the name of the particular social media platform were admitted into evidence in Prosecution Exhibits 2 and 5 without objection, and published to the members. In those exhibits, the members could find Appellant is asking "Kelly" if she had an account on this specific platform, which would make it easier for them to keep their communications private because it is known for its feature to delete content. Finally, as noted *supra*, we find the Government's evidence supporting the conviction was strong. Therefore, we conclude Appellant did not suffer any prejudice. *Andrews*, 77 M.J. at 402.

### b. Argument

We will assume without deciding that trial counsel erred during his findings' argument. Because trial defense counsel again made timely objections, we test for prejudice. Regarding trial counsel's argument, we find the two statements made by trial counsel to be minimal in an otherwise lengthy argument. Additionally, the trial judge here sustained the objections and issued a curative instruction as to one of the statements. We find the trial judge's actions here to be appropriate and adequate to cure any prejudice. "Absent evidence to the contrary, this [c]ourt may presume that court members follow the trial judge's instructions." *United States v. Stewart,* 71 M.J. 38, 42 (C.A.A.F. 2012) (citation omitted). Finally, as noted above, we find the Government's evidence in this case to be strong. Therefore, we conclude Appellant did not suffer any prejudice.

Having considered these events individually, we now consider them together and reach the same conclusion that Appellant suffered no prejudice to a substantial right and that there is no reasonable probability that the outcome of the proceeding would have been different.

## D. Timely Appellate Review

Appellant's case was docketed with this court on 30 August 2023. Appellant's counsel requested and was granted 14 enlargements of time[5] to file his brief. The Government opposed all the requested enlargements. Appellant filed his assignments of error on 6 January 2025. The Government filed its answer

---

[5] The first enlargement of time was for 60 days; the 14th enlargement of time was for 15 days. All other requests for enlargements of time were for 30 days each.

on time, 5 February 2025. Appellant then requested and was granted an enlargement of time for three days to file his reply. We rendered our opinion just over 20 months from date of docketing.

Because this opinion was not issued within 18 months of docketing, this delay is facially unreasonable. *See United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Because there is facially unreasonable appellate delay, we consider the factors articulated in *Barker v. Wingo*, 407 U.S. 514 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* at 135 (citing *Barker*, 407 U.S. at 530) (additional citations omitted).

Here, Appellant did not demand speedy appellate review. *See id.* at 138. Moreover, he has made no specific claim of prejudice regarding presumptively unreasonable delay, and we find none. *See id.* at 138–39 (citations omitted). Based in part on these considerations, we find the delay in appellate review did not "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). A substantial portion of the delay is the result of Appellant's requested enlargements of time. After balancing the *Barker* factors, we find no due process violation for appellate delay.

Finally, we considered all the facts and circumstances regarding the appellate delay and decline to exercise our Article 66(d), UCMJ, authority for excessive delay absent a due process violation. After full consideration, we find Appellant is not entitled to relief for facially unreasonable appellate delay.

## III. CONCLUSION

The findings as entered are correct in law and fact Article 66(d), UCMJ, 10 U.S.C. § 866(d) (2024 *MCM*). In addition, the sentence as entered is correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court